The first case today is number 181146, Painters and Allied Trades v. Forest Pharmaceuticals, and number 181147, Kiyosofsky v. Forest Pharmaceuticals. Thank you. Good morning, Your Honors. Brent Wisner on behalf of the Plaintiff Appellants. I'd ask for the Court's permission to reserve four minutes of my time for rebuttal. Yes. Thank you, Your Honors. May it please the Court. This case sits on all fours with Narotin. Just like Narotin, this case originated here in the District of Massachusetts when a drug defendant criminally pled and settled claims alleging fraudulent off-label promotion. This case, like that, seeks to recover those prescriptions caused specifically by that fraud. And this case involves allegations that the defendant fraudulently told doctors and consumers, people suffering from a debilitating disease, that this drug was effective when it wasn't. Now, I want to be very clear. We are not asking this Court to expand the scope of RICO or the reach of the law in this circuit. We are simply asking that this case be treated like Narotin. Because when Narotin is properly applied, it not only protects consumers, it actually protects honest drug companies. Because at the fundamental part of this case, we have a drug company that used unfair and fraudulent tactics to gain an advantage over its honest competitors. So we believe it's important that this case be treated like Narotin. And we'd be given a chance to go to a jury with the evidence we have for a trial on the merits. Could you clarify? You've got, as I understand it, all the sales of Celexa and some of the sales of Lexapro were all made at a time when the manufacturer had no claim to be able to rely on any FDA approval for the particular use that you say was being marketed for. That's correct. But then for some period of time, Lexapro then did obtain FDA approval. Does the claim here, as I understand it, include Lexapro marketing post that approval for the approved use? It does not, Your Honor. We specifically carved the case at that point specifically because of the issue. The reason we did that was because assessing causation in that context is difficult. Because now at that point, they're actually promoting to pediatric specialists, and we can't ascertain whether or not that was done consistently with the label or not consistently with the label. Because we don't know if they're promoting it for children under 12. As I understand it, the district court held, though, that that approval that occurred after the challenge sales sort of defeats your claim with respect to those sales, not only of the approved drug, but of Celexa that wasn't approved for this use. Yes, as well as for claims for children under 12. The approval in 2009 was just for adolescents and just for Lexapro. So the sales that would have been for children 12 and under, the judge didn't allow us to move forward with those. And that's actually really important because the evidence in the clinical trial data, when it comes to children 12 and under, is categorically negative. This is not an area where there's any dispute. Dr. Thomas Loughran, the FDA director who we had a chance to depose in this case, testified under oath unequivocally that to this day, there's still no evidence of efficacy in that group. And in fact, the FDA rejected that application in 2002. And you can find Dr. Loughran's testimony on page 441 of his deposition. It was not something we thoroughly briefed, but it is an important sort of part of it. And the simple fact is, is if we win on the under 12 group, then the district court's order has to be reversed. Because both Painters and Plaintiff Ramirez had standing to bring claims for under 12 purchases. Because Mrs. Ramirez, for example, she was purchasing drugs for her autistic child for a period spanning from when he was 7 years old up to 15. And it actually wasn't until they learned that the child was actually able to communicate effectively that they learned that it wasn't helping him, so that's why they stopped it. As a practical matter, it seems that it's pretty essential to your claim to establish that the events that occurred in early 2009 were not events that as a matter of law started the four-year statute of limitations running. We've got the unsealing of the government KTAM action, and then actually the filing of a RICO lawsuit alleging fraud. What's your best argument for why those two disclosures didn't put you on at least discovery notice under the statute of limitations that would give you only four years within which to file suit? Because what happened next disabuses us of that. That claim that was filed was actually dismissed prior to the entry of a criminal plea by the defendant. At that point was the first moment that they admitted to engaging in off-label promotion. Prior to that, they had consistently said there is no truth to this whatsoever. And the KTAM case being unsealed itself doesn't tell you that. We know because the case that was filed was dismissed because they didn't have enough information to prove their case. It was after the criminal plea where they went under oath and admitted to the factual predicates. Here's I guess where I'm having a little trouble. When you have the KTAM action unsealed and you have other parties alleging fraud through off-label marketing, I can see where if you represent a consumer only, perhaps you might not know were they doing off-label marketing or not. But when you're representing a TPP and you've got someone managing your formulary, they must have either known or had access to information as to what this drug was or was not being marketed. I mean, I believe we're well now into the realm of weighing facts, Your Honor. This is a disputed issue of fact, one that we would try to a jury. The beginning premise for assessing to what extent a jury could find either way on the facts is what basis is there for looking at this record and concluding that a reasonable company in your client's position or plan wouldn't know what the drugs that it's reimbursing for and putting on its formula are being marketed for, particularly with the marketing, as alleged in the complaint, seems to have been so aggressive. Well, as a matter of law, Your Honor, I believe the case law is pretty strong. The simple filing of a complaint that was not surrounded by publicity itself does not itself put a TPP on notice. I mean, it would be a bit ridiculous to assume that third-party payers are monitoring all federal dockets for the unsealing of ketan cases and then reading those unsealed documents to see if there's anything that could relate to a claim involving RICO. I mean, at some point, reasonable becomes unreasonable, and I think that's the point. Where it changes is in 2010, where there's a press release from the Department of Justice, where there's an open admission of guilt by the defendant. And that's the first time there's really notice to the world at large that there has been actual criminal and potentially fraudulent misconduct. On the significance of that point, on that point, as I understand it, hinges the entire class action. In other words, if the statute of limitations started to run in early 2009, then under American Pike, you would have preserved your ability to bring the individual claims that you're bringing on behalf of the named plaintiffs, but you'd be out of luck with respect to class certification. On the other hand, if you've got the later date, then you don't need the tolling. You know, I think that's a complicated issue, and I think it would be something that we'd want to address with the district court if that's required. What's wrong with that analysis under the Supreme Court? The China Agritech case, Your Honor. In that case, we actually, there was a piggybacking of tolling after there had been an actual resolution on the class certification issue. Here, a company files a case and then voluntarily dismisses it before any substantive ruling, whether it be on a motion to dismiss or class certification. And so, I do believe there is an area in a reading of China Agritech that allows for tolling nonetheless when there hasn't been any meritorious or merits-based assessment of the underlying case. You should always get a daisy chain of class actions going on ad infinitum if you allowed it to turn merely on whether it was dismissed as opposed to dismissed by the court. Well, not exactly, because if there had been a dismissal on the merits, or there had been an assessment on the merits, then that would make sense, right? Then you really can't use American tolling. But when there hasn't been, if it's just some company that files an action and dismisses it because they don't think they have a case, that hardly creates the sort of notice to other third parties. There was no notice giving. In Agritech, it was a type of securities case. You would want to rely on the tolling. For example, if the 2009 class actions were a nothing and the statute of limitations started to run in 2009, even your individual claims would then be lost. You need to show that there's a sufficient nexus between those claims and your claims so that you do get the American pipe tolling. Sure. Then how would you establish that nexus and get the American pipe tolling, but then not get the limitation on that tolling? Well, again, Your Honor, and I appreciate the point, but you're assuming that it starts in 2009. You don't have the problem if it doesn't start in 2009. Exactly. So if it does start in 2009, I think that's the premise of your question, then you're right. We would require tolling to be timely filed individually. We'd have to rely on American pipe tolling. I do think Agritech can be distinguished insofar as there was no dispositive, there was no merits-based ruling, and in Chinatech, that was already the point. In addition, that was a securities case where once a case gets filed and certification is sought, they have to give notice to the class. There is no such protections here, and I think a reading of the first rule of civil procedure that doesn't allow to abrogate the rights of any litigant based on procedure, I don't think that would be a proper interpretation of Rule 23. This is an area of law that is unsettled. I don't think we need to get there. I think there's a disputed issue of fact about when the trigger date happens, and therefore, you know, let the jury decide. If that is the case, then at trial, the jury goes, no, it started in 2009, then that puts us in the position that we are. Your Honor, I know you had a question. Yes, thank you. Before you sit down, I would just like you to help me. What is the legal significance of the Food and Drug Administration's approval of Salixa? It is a piece of information. It is the opinion of an expert agency, but it is not dispositive. It does not carry the force of law. Does it have the force of law? No, it does not, Your Honor. In every products liability case, we have the same thing. A label has been approved by the FDA, and we're saying, Your Honor, ladies and gentlemen, this is an inaccurate or insufficient label. And so it's a piece of evidence that the jury can consider, but it doesn't disabuse the jury process. And in fact, if it were to, then on the counter, right, when they bring an enforcement action against the defendants, the FDA's decision that they violated the misbranding laws would be dispositive. And obviously, force would want to have recourse to the courts as well as a jury in that context. Force of law? It doesn't have force of law. Does it have any force at all? Absolutely. It's a persuasive piece of evidence that a jury can consider, as they do in every products case. I mean, I've tried cases where it's an FDA-approved label, and they go, It's FDA-approved. Everyone says it's safe. And then I go, Well, actually, it's not, ladies and gentlemen. Let me show you the data. Sometimes I win. Sometimes I lose. But that's a point of disputed issue of fact, and that's why it goes to the jury, Your Honor. Thank you for your time. You confused me a bit there. You mean Selexa was never approved for the off-label? That's correct. You're talking about Lexapro. Exactly. We're talking simply about Lexapro in adolescence. Thank you for your time. Hey, police and court. Good morning. I'm Andrew Ceresney. I represent Forest Pharmaceuticals and Forest Laboratories, now part of Allegan in this matter. Let me start with the RICO injury issues, which I think, to understand those, you need to really just go back to first principles here. We think this is a straightforward issue. To prove RICO injury, someone must show concrete economic injury. And in the case of pharmaceuticals, you need to show the drug that you took was ineffective. That's the requirement. And in this case, there was no individualized evidence of inefficacy. With regard to the individual plaintiff, he took the drug for eight years. His doctor testified that it was effective, and that's why he prescribed it for eight years. Therefore, there's no – Is there a line of cases that you don't have to have individual injuries? Just Neurontin. There's actually not a line of cases. There's one case. Three cases. Three cases. All one matter, though, Neurontin. And what we would argue – We do have that rule in the circuit, though. You do. And what does that do to your case? I think it does not apply in this case. It is not on all fours in this case. In fact, I think it's vastly distinguishable from this case, Your Honor, for a number of reasons. First, in that case, 90 percent of the prescriptions were off-label. In this case, 95 percent of the prescriptions were on-label. So totally different. Second, in this case, you have FDA approval. And to go to Judge Kayada's point, that FDA approval did occur in 2009, but what the FDA found when it approved Lexapro for pediatric usage was that it found that it was an efficacious drug. And that doesn't just happen in 2009. It's true in – Your colleague says that FDA approval often means it's something that the jury has to consider. Well, actually – In this case, we have a summary judgment, don't we? We do, but I disagree with him on that. But actually, Your Honor, let me just back up. I don't think you even get to the issue of whether you need to rely on the FDA approval. I think the issue in this case is whether Neurontin should apply to these facts. And based on the distinctions with Neurontin, including FDA approval in this case, there's no basis to rely on generalized evidence of injury. You need individual injury to prove a RICO injury. You can't rely on the argument that the class as a whole is ineffective. You need to show that the particular plaintiff, that the usage of that drug by that particular plaintiff was ineffective. And Neurontin, because there was no – I'll point Your Honor to page 49 of Neurontin, where the court found that the evidence was unequivocal that the drug was not effective. And this is not that case. Why? Because it cannot be unequivocal that this drug was not effective because the FDA approved this drug. I'm confused as to how you're allocating the burdens here. If your client sold me a sugar pill marketed to cure cancer, are you saying – and then I found out, you know, I'd been naive and thought it was going to work. And then I found out later on this was a fraud. They were marketing this for which it had no basis. I don't need to come in with individualized proof. I would just need to show that this was a fraud and I would pay money for a useless product. That would fit under Neurontin. And what I'm trying to argue on – How about Celexa? As I understand the record, your client went out and intentionally sold this product to parents and pediatricians to treat adolescents and children for a use that it had never been approved for by the FDA. And how do you – and it never has been approved by the FDA. When the FDA approved Celexa Pro for pediatric usage in 2009, what it said was this approval would apply if we – if Forrest had applied for Celexa, they would approve it for Celexa as well. But they didn't. And the reason they didn't do that was because they were not marketing. It was a generic drug at that point. There was no purpose in Forrest at that point investing in getting pediatric approval for Celexa. But my point is, Your Honor, that by the FDA saying that, what they're saying is that this drug is efficacious and therefore you cannot assume that any person taking that drug, generalized evidence of inefficacy, is not appropriate in that circumstance. Let's stay with that point because I think you're stretching some of our case law a little bit here. We have certainly held at least twice and probably three times that if you've got an FDA approval in hand for a given use, you can go out and market it to people for that use and not have to worry about someone coming in and saying, approved or not, you're liable for it, unless there's some new information the FDA didn't have. But we don't say that because we decree the FDA must always be right, forward and backwards. We say it because this is the way the process works and you should be able to rely on that. When you were selling Lexapro before you had the FDA approval, why should the fact that you subsequently got FDA approval, on which you could not have relied, immunize your sales? It's not a question of immunizing sales, Your Honor. It's a question the plaintiff is trying to recover for injury. And for them to recover for injury, they need to show that the people they represent, the individual in this case who took it for eight years and the doctor who testified was efficacious, and the painters, the third-party payers. Suppose the jury believes that the expert said it was not efficacious because they look at the studies and they're experts and they buy their experts. I think what you're saying is the jury could not believe they're experts because of the subsequent FDA approval. What I'm saying is that they need to provide individualized evidence of impact on their particular plaintiffs. As an expert says, this is like the sugar cubes in my earlier example. It's not efficacious. I don't think an expert... So the first question here, and let me get to the FDA point in a minute, but I think the point is Narantan is the only case that this Court has held that generalized evidence of injury is appropriate. And what we would argue in this case is that this is a totally different case from Narantan because when you have at least equivocal, let alone evidence of an FDA approval, you can't generalize to the whole class. But taking then, if you then go to the FDA approval itself, this Court and Marcus, this Court and D'Agostino has said time and again that we shouldn't second-guess the FDA approvals. And I think Judge Durell, your point on this is right, which is... I don't know what my point is. I think your question, which is isn't the FDA, isn't their determination subject to some deference? I think it is in this case because what we're saying is you shouldn't second... a determination. And what you're doing if you do that is you put the... We haven't quite said that. I think you're over-reading those decisions. I have a passing familiarity with those decisions. Yes, you do. You seem to be saying that we said once the FDA decides something forever, that is fact handed down from Sinai and you can't contest it. I don't think we've ever said that. I think we've talked about the reliance interests of a manufacturer who has approval in hand, but we don't have that here with respect to the pre-approval sales. I think your honor is focused on the pre-approval sales, and our point there is even if those sales occur pre-approval, the approval demonstrates that the FDA has determined that the drug is effective. And there's no reason why that determination, even if it occurs after the sales have occurred, shouldn't apply to the prior because it's not like overnight the drug changed. The drug is the same drug that they've been selling throughout the whole period of time. Sure. You want us to declare that it's the gold standard. Once the FDA decides that, then for all purposes in litigation, it is an effective drug. I do want you to hold that, but you don't even need to hold that to hold for us on this case because in this case the question is did they have to present individualized evidence of inefficacy for the plaintiffs that they are representing? Even if there was no FDA approval? Even if there was no FDA approval, but that's not the case. Okay, but that's Neurontin. The sugar cubes is Neurontin. This case is vastly different. You don't have to decide whether, you know, we can go, we can talk about a huge spectrum between the sugar cube and this case with FDA approval, and I think it's clear that in this case with FDA approval, you cannot say that the FDA approval. And the line of questions we're on right now is let's put to one side FDA approval, focus on the time period where there isn't one. Pretend you haven't got it. How then is it different than the sugar cubes? It seems to me it's only different because you've got an expert who will say it's different than the sugar cubes. They've got an expert who says it is the sugar cubes. That's why we have a jury. Your Honor, though, the FDA approval doesn't say that it just became effective the day we approved it. Now you're back to the FDA approval. No, but the FDA approval is still relevant. That's our point. I think my point is that your argument is contingent on us endowing the FDA approval with some retrospective import. No, I think what our view is contingent on is finding that the evidence is at least equivocal when you have an FDA approval and that when the evidence is equivocal, which this court said in Naranton, it was not deciding when the evidence is equivocal whether you can rely on generalized evidence of injury. All we're saying is when you have an FDA approval, that that means that the evidence is equivocal and therefore you should need individualized evidence of injury. This is what I don't understand. I have to say this is obviously a complicated area, and I have read Kaiser. You call it Naranton. I call it Kaiser over and over again. And the principle I get on this point is that you can have generalized evidence as a general principle. I don't see, frankly, at this point, if that case is applicable, how we can ignore it just because it's one case. One case still sets precedence in this circuit. I completely agree, Judge, but I would just point you to page 49 of that decision, which specifically says we need not address what the standard for efficacy would be if there were no DBRCTs as drug trials in existence or if the results of the drug trials were equivocal. And what I'm focused on here, Your Honor, is that the evidence here is at least equivocal, let alone we think definitive, because there was FDA approval in this case, and the FDA approval, even though it occurred after the sales, and I understand Your Honor's point, demonstrates that the evidence is at least equivocal on the efficacy in this case. You have the FDA saying, and you can decide whether there's new evidence or not, and I would say the only way you should reject that is new evidence, but put that aside, that at least means it's equivocal, let alone we think very strongly in favor of efficacy. I want to get, Your Honor, to the statute of limitations point, if I can, but I just want to see if Your Honors have any further questions on this issue. Okay. Statute of limitations issue, Your Honor. Judge Cariotta, you did make the points that we would make on this, which is, first of all, what we had in this case was the first RICO claim was filed in March of 2009. This case was filed in November of 2014, over four years after that. Judge Gorton held that that March 2009 filing put the plaintiffs on notice of the claims in this case, put them on notice that, as Rotella says, that they knew or should have known of the injury, and therefore that notice is enough to render the statute of limitations applicable. China Agritech, which you cited, means that the class claims can't proceed because they are time-barred. And I would also point, Your Honors, to Rotella, the Supreme Court case, where the court found that it was not the filing of a claim by the government about false promotion and the like that put the plaintiffs on notice. In that case, what they found was it was the inefficacy that was clear from filings before that in the Rotella case. So I think the Rotella case is right on point on that. On the under 12, the 12 and under cohort, which the plaintiff focused on, there again, even though the FDA didn't approve it for below under 12, again, what we would point to is the equivocal evidence in this case, which requires, from our perspective, at least individualized evidence of inefficacy in the plaintiffs. So in other words, we have studies that show, and I would actually take issue with one thing the Plaintiffs' Counsel said, which is that there are no positive studies for under 12. In fact, MD-18 was a positive study for under 12. And Dr. Loughran, who testified, the FDA official who testified in this case, testified that that was a positive study for under 12. And therefore, there was at least equivocal evidence in the record in this case that the drug was effective for under 12. So doesn't that make you a jury question? I do not think so, Your Honor, because the question is, again, going back to what we were talking about before, whether the generalized evidence of injury is something that the court can consider. And from our perspective, Narantin is limited to its facts where you had 95 percent, 90 percent off-label usage, where you had certainly no FDA approvals, no positive studies. The court in Narantin specifically said that it concluded, the Court of Appeals concluded, that there were no positive studies, only negative studies. Again, this goes to the point about whether you should generalize Narantin to cases like this. Plaintiffs, under sort of general tort law, plaintiffs need to show that the drug that they took didn't just have a propensity to be ineffective, but it was actually ineffective in their usage. Well, but when you add, it's those last few words, that prepositional phrase you add that is puzzling me, in your usage. If the drug is not effective at all, then I don't need to prove anything about how it affected me. I take your premise, if a drug was effective 95 percent of the time, or even 5 percent of the time, and not effective the others, then you'd need to know for a given individual. But here you have some testimony and studies that say ineffective. You have one other that says effective, if we're talking about selective, and then throw in the FDA approval. But if the jury isn't bound by that FDA approval, separate question, and the jury could find it's not effective, period, then why do I need any what you call individualized study? It would be ineffective for everyone. Your Honor, there was no evidence in this case, in the record, that there was no patient who took this drug, that it was basically a sugar cube. There's no evidence in the record here. But you get a negative study. If you get a study that shows you're not doing better than a placebo, that to me says it's like the sugar cube. Actually, Your Honor, I think for antidepressants, I think the vast majority of studies are negative. And that doesn't necessarily mean that antidepressants are not effective at all. What it means is in that particular study, they couldn't show efficacy. That's because it's challenging for antidepressants to show efficacy. And therefore, negative studies don't mean that the drug doesn't work. Negative studies just means in that particular study, they didn't show that the drug was more efficacious than the placebo. It doesn't mean that the drug is like a sugar cube, Your Honor. With that, unless you have further questions. Thank you. Your Honors, I'd like to address a couple of points raised by Mr. Trezani. The first thing is there is evidence that the drug was ineffective specifically for children here. Dr. Saito, to which opposing counsel referenced, he actually testified at deposition. We showed him all the data. We showed him the internal documents. He said under oath, I was misled. I'm not prescribing this stuff anymore. So this idea that the doctor was prescribing it thinking it was effective, that's belied by the evidence. Second, this case is not, this case is very much Neurontin. Opposing counsel said that there was no FDA approval in Neurontin. That's factually untrue. For the neuropathic pain indication in the Neurontin case, there had been an approval for a subset by the FDA just a few years before Neurontin went generic. Just like here, there was approval for a subset of the pediatric indication just before it went generic. And notwithstanding that approval, the First Circuit here said, listen, you can still show it's ineffective. So the idea that that distinguishes Neurontin from this case is just factually untrue. You don't have to show that it's on all fours with Neurontin. Fair enough, Your Honor. I just want to clarify that that's a factual point. And the second factual misstatement is that there was no positive studies in Neurontin. That's just untrue. In fact, in their briefing, they admit it. Judge Gorton just got that wrong. He said there was no positive studies in Neurontin, which is a bit difficult to understand, because when I argued the motion with the judge just down the hall, I said, Your Honor, that's not true. And I showed him the studies that were positive in Neurontin in the case law. And for some reason, it didn't make it into the order. I'll point out that there is a recent 2016 publication, a meta-analysis done by 19 independent researchers from around the world. They came together and they looked at all the data for Celexa, Lexpro, as well as all other antidepressants. And they concluded that these drugs are not effective. They do not differentiate from placebo. So that is a new, valuable piece of peer-reviewed scientific evidence that we would present to the jury that they would weigh against, for example, the FDA's approval in 2009 for adolescents. I would also point out that for the- What did the district court do with that? Didn't discuss it or mention it. We argued it, obviously, but it was not addressed by the court on the order. Additionally, I would point out that this is, without question, the sugar cube case for at least under 12. There's no equivocation there on the data. It's overwhelming. Even in MD-18, if you just look at the under 12 data, it's not even remotely positive. It doesn't differentiate from placebo. And Dr. Loughran, who, by the way, after leaving the FDA, worked for Forrest as an expert witness to testify about the efficacy of Celexa and Lexpro, the very physician at the FDA who approved Lexapro in 2009, he left the FDA and started working for Forrest two months after he left as an expert witness. And he testified under oath in 2013, it's in the record, that this study would be negative if they were unblinded. And he also testified that there was absolutely no evidence of any efficacy under 12 and that today, if they tried to get approval, the FDA would reject it. That's clearly in the record. Finally, I would point out that... There's something about this case that bothers me from the first time I read it. Sure. And that is the issue of case controversy as to the individual's plaintiffs. Why isn't that doctrine applicable? I'm not sure if I understand the issue, Your Honor. You don't show that they've actually suffered an injury. Why do you have a case of controversy? Well, I'd argue that they have. Giving a patient a drug that does not work, that does not outperform placebo, when they're suffering from depression, we're talking about children here, that's an injury. It doesn't make it difficult for children or old people. That's true. Case of controversy is the same principle. That's true. And because of that fraud, Your Honor, consumers, specifically Mrs. Ramirez and third-party payers like the Painters Union, they were specifically deprived of money. They paid money for these prescriptions that never would have issued absent the fraud. And that's the injury. That's what RICO. RICO doesn't allow for personal injury. It just allows economic injury. Thank you for your time, Your Honors. Mr. Seresny, what about this 2016 study? How was that dealt with in the district court from your perspective? Your Honor, we can, if you'd like, submit a small letter brief on that. I mean, I think there is counter studies. I mean, I think it's clear that that's not the only study that was out there. My question was how was it dealt with in the district court? We'll have to get back to you, Your Honor. That will be fine, either side. You're welcome to, within a week. Let us know if there's any additional information about that. I just don't remember reading about it. Yes. Sorry, Your Honor. That's all right. Thank you both.